A. ADELBERT E. W. BARCLAY, plaintiff in error, *vs.* JAMES J. WARING, guardian, defendant in error.

[This case was argued at the last term, and the decision reserved.]

1. Where title to property is put in trustees for the use of husband, wife and children, on certain contingencies set out in the marriage settlement, such title in the trustees is not divested by a verdict of a total divorce in favor of the wife, so as to vest the property absolutely in the children, the trustee being no party to the proceeding in the divorce case, and the verdict of the jury being silent in respect to the disposition of the property, although the property was embraced in a schedule (not sworn to) attached to the libel for the divorce; particularly as no judgment or decree of the court was rendered which disposed of the property in any way.

2. Where an ante-nuptial deed settled certain property of the wife, vesting the legal title in trustees for that purpose, "in trust, nevertheless, to and for the sole and separate use of the said Margaret Marshall for and during her natural life, not subject to the debts, contracts or control of the said Adelbert, her intended husband, or any future husband, and from and after her death, then in trust to and for the sole and

separate use of such person or persons as the said Margaret may, by deed or will, duly executed, appoint; and if the said Margaret should depart this life without making such appointment, either by deed or will, then in trust to and for the husband and children of the said Margaret, should they survive her;" and where the said settlement had been mutilated by tearing off some of the signatures thereto, and a post-nuptial deed had been made by the husband, by virtue of his marital rights, settling the property differently, and the wife had obtained a total divorce from the husband, and had died leaving an only child, and this child, by her guardian, brought a bill in equity to cancel the post-nuptial, and set up the ante-nuptial deed, on the ground that the latter had been fraudulently mutilated by her father in order to make the former deed, and alter the terms of settlement after the marriage; and where the father defended the case by alleging that the ante-nuptial deed was mutilated and destroyed before the marriage by the trustee, in his presence and that of his wife and the trustee; and where both wife and trustee were dead at the time of the trial:

*Held,* that the husband, the other parties to the settlement *in esse* at its execution and alleged destruction, being dead, was an incompetent witness to prove the destruction of the marriage settlement; and as he was the only witness to prove its legitimate destruction before the marriage, the decree setting up the ante-nuptial and canceling the post-nuptial deed was right, its original execution having been sufficiently established by proof.

3. The deed of settlement thus set up gave the property to the children and husband on two contingencies: first, that the wife and mother made no other appointment; and secondly, that they survived her; and inasmuch as the deed in express terms contemplated not only the defendant then about to marry the wife, but any future husband she might afterwards marry, it must mean by the words "the husband, should he survive her," some person who should be her husband at her death; and as, after the divorce *a vinculo matrimonii,* the defendant ceased to be her husband, and at her death was not the husband who survived her, he took nothing in the property conveyed by the deed of settlement.


Title. Divorce. Trusts. Marriage Contracts. Witness. Husband and Wife. Before Judge TOMPKINS. Chatham Superior Court. February Term, 1876.

Reported in the opinion.

W. U. GARRARD, for plaintiff in error.

JACKSON, LAWTON & BASSINGER, for defendant.

JACKSON, Judge.

This case involves very interesting questions. It came before the court below upon a bill filed by Waring as the guardian of Miss Barclay, against Barclay, the defendant, her father. The bill alleged that the mother of Miss Barclay was possessed, in her own right, of certain real estate in Savannah, the gift of Mrs. Marshal, who had adopted her mother, and being about to marry Barclay, her mother executed an ante-nuptial deed, or marriage settlement, whereby the property was conveyed to Gordon and Habersham as trustees, for the sole use of the mother during life, with power to appoint, by deed or will, beneficiaries to take after her death, and if she died without making any appointment, then the property to go to her husband and children at her death. She was to have the sole use, free from the control of the intended husband, or any future husband. It alleged that after the marriage, Barclay mutilated the deed by tearing off Gordon's name and his own name, and then made a deed by which he gave himself a life estate, if he survived his wife, with power to appoint beneficiaries after his death, Gordon being made trustee of this last deed too. Afterwards, the bill was amended by alleging that Mrs. Barclay obtained a divorce *a vinculo matrimonii* from Barclay, for adultery and bad treatment, to which libel for divorce the schedule of property filed embraced this property of Howard, in trust for the uses aforesaid; and it charged that, inasmuch as the jury gave, by their divorce verdict, none of the property to husband or wife, it all vested in Miss Barclay, the only child, by the silence of the jury in respect to it. The bill prayed that the deed made by Barclay, after marriage, under his pretended marital rights, be canceled, and that the marriage settlement be set up, and that the entire property be decreed to belong to the complainant by virtue of that settlement and the divorce, or at least a moiety thereof, if the divorce did not divest the title of Barclay, and if he could still take as the surviving husband of Mrs.

Barclay, under the settlement, after he ceased to be her husband by the divorce *a vinculo matrimonii*.

The answer denied the destruction of the marriage settlement after marriage, but alleged that it was done before marriage, by Gordon's assent as trustee, and Mrs. Barclay's consent, and Mrs. Marshal's consent—Mrs. Marshal being the original donor of the property to her adopted daughter; that the names were torn off by Gordon in the presence, and by the approval, of all parties. It took issue, also, on the effect of the divorce, and set up the limitation act of 1869 in bar of the amended bill.

Discovery was waived, so that the answer was not evidence as an answer; but it was agreed that the facts set up therein should be considered as the answers of defendant to interrogatories, subject to objections for irrelevancy, or any illegality.

The execution of the marriage settlement was proven by a surviving witness, and the delivery of the paper to Gordon—Habersham, the other trustee, not present and signing. This witness had been the nurse, or confidential servant, of Mrs. Barclay, and was, when sworn, married. She knew nothing of its mutilation. The deed of gift of Mrs. Marshal to her adopted daughter, was made November 14th, 1855; the deed of settlement, November 16th, 1855; the marriage was solemnized November 21st, 1855, and the deed, or settlement, Barclay made after marriage, was dated December 22d, 1855. Both deeds of settlement were in the handwriting of Lloyd, a well-known attorney, at Savannah. Several witnesses were examined, but Barclay alone witnessed the destruction, or canceling, of the ante-nuptial deed, and proved the assent of all parties thereto. Mrs. Barclay died in 1866. The divorce was made final by last verdict, in 1862, having been pending for some terms of the court.

The case was submitted to the chancellor, by consent, without the intervention of a jury, who found and decreed that the ante-nuptial deed should be set up, and that the

divorce operated to divest all the interest of Barclay, and that the property should be decreed to be the sole property of complainant, and that Barclay should account for rents, issues and profits, while he had enjoyed the life estate. Barclay excepted, and the case is before us.

The first question which we propose to consider, is as to the effect of the divorce upon the title to this property in Howard, the trustee, for the uses therein named.

The schedule filed with the libel named this property, and named Gordon as trustee, but it was not sworn to. There can be no doubt that at the time of the granting of this divorce, the law allowed the jury to dispose of the property of the coverture, to either husband or wife, or divide it, and if they did not do so, it would go to the children of the marriage. But we think that this was confined to property in which the legal title was in one of the parties to the suit. It would certainly be rather loose to hold that the title of a trustee could be divested in a suit to which he was no party. If a bill had been filed ancillary to the libel for divorce, such a decree might have been framed as to have divested his title; but he ought to have been heard in some way, in defense of his title, or he ought to have had the opportunity. Nothing of the sort appears. We rather think, too, that some action should have been taken by the court upon the verdict of the jury before the title would vest in the child. Grant that the silence of the verdict was equivalent to finding the property to go to the child, still, we think that there should have been some judgment or decree of the court, predicated upon the verdict, and directing and vesting the title in accordance with the meaning of the verdict. We hold, therefore, that the title of the trustee, Howard, was not divested by the mere silence of the jury in respect to this property, so as to vest an absolute estate in the child.

This view dispenses with any necessity to examine the constitutional question made by counsel for defendant, or the statute of limitations. The latter question is controlled,

however, by the case of *Lake vs. Hardee et al.*, 56 *Ga. R.*, 459, as the minor had no guardian until after 1870.

2. The great question in the case, then, is in respect to the ante-nuptial deed. Was it executed? Was it canceled before marriage? Could it be canceled after its execution? If it still stands, how does it dispose of this property?

We think, with the chancellor, that the proof of its execution is ample. Both trustees need not have signed it. One of them, Gordon, did sign it; so did Barclay, who was about to marry, and Miss Marshal, soon to be Mrs. Barclay. It was signed in presence of Loyd, and of the confidential friend or servant of Mrs. Barclay, then Miss Marshal, and the latter witness swears that it was delivered to Gordon, as its execution purports was done.

This ante-nuptial deed, thus executed, is still valid, unless legally canceled. It is clear that this could not have been done after the marriage, whatever might have been done by the assent of all parties then in being, before the marriage. Was it torn before marriage, so as to take off the signatures of Gordon, trustee, and of Barclay, the intended husband? The only witness to that alleged fact is Barclay. Is he competent to testify? This is a contest between him and his child. The child was represented on that occasion, and in that transaction, by the trustee, Gordon. Gordon was the other party to the contract for her. He is dead, and his mouth being closed in respect to this contract—both its execution and mutilation—the law closes the mouth of Barclay also. Besides, the mother of the child, another party to the deed, is also dead. Every party to it is dead, except Barclay. Ought he to be allowed, alone, to make the transaction what he pleases; to vest in himself, thereby, absolute title by virtue of his marital rights, so as to enable him to make just such a settlement as he alone shall prefer? We think not.

The ante-nuptial deed having, therefore, been executed and not destroyed before the marriage, is a valid deed. Even

if the sayings of dead persons could be allowed as testimony, still the chancellor, standing in the place of the jury, has found that the evidence does not show the cancellation of the deed before marriage, and we would not interrupt his finding thereon.

3. This ante-nuptial deed must, then, be set up, and the post-nuptial deed of Barclay canceled; for he had no right to make it, unless the first did not exist, as that took away his marital rights. The next, and last, question is, how does that deed dispose of this property at the death of Mrs. Barclay without appointing any one to the enjoyment of it? She died, and appointed nobody to take the use.

The terms of the deed are quite peculiar. The words are: "to and for the sole and separate use, benefit and behoof of the said Margaret Marshal for and during the term of her natural life, not subject to the debts, contracts or control of the said Adelbert, her intended husband, or any future husband, and from and after her death, then in trust to and for the sole and separate use of such person or persons as the said Margaret shall appoint by deed or will duly executed; and if the said Margaret should depart this life without making such appointment, either by deed or will, then in trust to and for the husband and children of the said Margaret, should they survive her."

Now, Barclay was divorced from her in 1862, and she died in 1866 without any condonement or remarriage. So that he was not her surviving husband at her death. He was no husband at all. The tie was absolutely dissolved. Do, then, the words in the deed: "to and for the husband and children of the said Margaret should they survive her," apply to this divorced man, when we take these words in connection with the fact that the deed contemplated and embraced also "any future husband."

It is true, that while a divorce which is granted for causes which rendered the marriage void *ab initio*—causes existing at the date of the marriage—absolutely annuls all conveyances touching the marriage; 2 Bishop on Marriage and Divorce,

Barclay *vs.* Waring, guardian.

690 *et seq.* Yet where the divorce is obtained for some post-nuptial act, as in this case for adultery, the marriage settlement would remain unaffected, 2 Bishop on Marriage and Divorce, 697 and 717 *et seq.* But still the instrument has to be construed from the plain intent and meaning of its words. What then do the words, "the husband should he survive her," mean? Suppose Barclay had died, and Mrs. Barclay had again married, such second husband was embraced within the terms of this settlement, and would have taken one-half of the property at Mrs. Barclay's death, if she had not appointed otherwise. It was a settlement which contemplated Mrs. Barclay, or rather Miss Marshal, and *her* children by any husband, and any husband who survived her as her husband. If he who was once her husband did not survive as her husband, he took nothing. Suppose, after the divorce, she had again married, and the second husband and Barclay both survived her, can there be any doubt that the divorced man would have taken nothing by the very terms of the settlement, and that the second husband who survived as husband would have taken? We think not. Then it appears to us clear that the words of this instrument meant to convey title only to the husband of this woman who should survive her as such; Barclay did not survive her as such, therefore Barclay was not intended by the settlement to take, as he was at her death a stranger to her.

This ruling is right in principle. The truth is, that on principle every divorce *a vinculo matrimonii* ought to place the property of the parties to the marriage just where they were before marriage, so far as husband and wife are concerned, unless the jury dispose of it otherwise; especially ought this rule to be applied to the guilty party who made the divorce necessary. The very consideration of this settlement was the vow of fidelity on the part of Barclay. The property was confessedly the wife's before the marriage; by agreeing to be her husband he got an interest in it; that agreement was for life; it was to be faithful to her as long as he lived; he broke the contract, committed adultery, and

neglected and wronged her until his wife sued and got the divorce. The consideration of the contract on his part having failed by his own bad conduct, ought he to get something for nothing? I think not; and while I admit that the authorities are as cited from Bishop, yet I think that they are wrong in principle; and that in every case where either party violated the contract of marriage so as to annul it, *that party so guilty of breach of contract as to cause it to be set aside,* ought to forfeit all rights under it, and should be put where he was before the marriage so far as the wife's property, or what she brought into coverture, was involved.

But we, the whole court, only rule that under the terms of this instrument, reference being made in it to future husband, and the paper clearly contemplating the surviving husband as such—the words not being *descriptio personæ,* as meaning Barclay, but meaning whosoever should *be in life at her decease and then sustain the relation of husband to her,* Barclay took nothing because he did not survive her as *her husband,* but at her death was an entire stranger to her in law—as much so as if he had never been her husband.

Judgment affirmed.